## THE NEW ORLEANS.

(District Court, D. Rhode Island. July 15, 1909.)

### No. 1,206

COLLISION (§ 91*)—STEAM VESSELS MEETING—VIOLATION OF NARROW CHANNEL RULE.

The steamer Bayport, passing up the Providence river on a half-flood tide, came into collision with the steamer New Orleans, passing down, and libeled the latter for damages. The Bayport had cast off a barge she had in tow a quarter of a mile further down, which was proceeding by its own momentum and the help of the tide to the port of the Bayport to an anchorage on the west side of the river. The Bayport was in the middle of the channel, and when they were at least 1,500 feet apart the New Orleans gave a passing signal of one whistle, which the Bayport did not hear; but she shortly gave two whistles. The New Orleans at once answered with three blasts and reversed. The Bayport repeated her signal, but held her course in the middle of the channel, not reversing until just before collision, while the New Orleans continued to back and had practically or entirely stopped when the collision occurred. Held, that the position of the Bayport's former tow on her port side did not justify her in violating the narrow channel rule, requiring her to keep to the side lying on her starboard side, nor in repeating the signal and keeping on after it was crossed; and that, even if proper, she did not starboard her helm in accordance with such signal, and was herself in fault, while no fault was shown on the part of the New Orleans.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit for collision.

E. P. Carver, R. E. Goodwin, and Carver, Warner & Goodwin, for libelants.

Daniel H. Hayne, Frank Healy, and Alex Thain, for claimants.

BROWN, District Judge. This libel is for a collision in the Providence river at 3:50 p. m., December 4, 1907, between the New Orleans, an iron screw steamer 249 feet long and 33 feet beam, and the Bayport, a whaleback steamer 265 feet long and 38 feet beam, loaded with a full cargo of 2,360 tons of coal.

The New Orleans was going down the river, and the Bayport up the river. The collision was in mid-channel; the channel being about 600 feet wide.

The exact place of collision is in dispute. It was between Wilkesbarre pier and Harbor Junction wharf, and, according to the preponderance of testimony, nearer the Wilkesbarre pier than Harbor Junction wharf, which along the middle line of the channel is about half a statute mile southerly from Wilkesbarre pier.

The stem of the New Orleans struck the starboard bow of the Bayport some 7 or 8 feet from the stem of the Bayport. The vessels separated immediately; the collision being described as a mere touch.

The only damage was to the Bayport, whose plates were torn and broken and her frames and forward bulkhead broken and bent in.

The charges of fault pressed against the New Orleans which require consideration are:

(1) Excessive speed.

(2) Failure to blow a danger signal.

(3) Failure to starboard her helm.

(4) Failure to perform an alleged duty to keep clear of the Bayport as a privileged vessel.

(5) Putting her helm hard aport.

The Bayport, shortly before the collision, had in tow the barge Bombay, which was on its way to an anchorage on the westerly side of the river near the wharf of the Seaconnet Coal Company, its consignee. The barge was cast off below Sassafras light, and the engines of the Bayport, according to her log, continued to run for two minutes, when they were stopped, at 3:47. That they were stopped so soon is disputed by the New Orleans.

The tide was half flood and running about a knot and a half an hour.

After letting go the barge, and when abreast of Sassafras light (about three-fourths of a statute mile below Wilkesbarre pier), and while in mid-channel, Capt. Jansen of the Bayport noticed the New Orleans coming down and waited a second or two for passing signals. He says he heard none, and then blew two blasts, when the vessels were 1,500 feet apart; the New Orleans being on his starboard bow. He also stated that when the Bayport gave two blasts the New Orleans was a little below Wilkesbarre pier. From marks made by Jansen on a chart it appears that the vessels were more than 3,000 feet apart at this time.

His signal of two blasts was answered by three blasts from the New Orleans, and to this signal the Bayport replied by repeating her signal of two blasts.

That the above signals were exchanged by the vessels is not in dispute, i. e., two blasts from the Bayport answered by three from the New Orleans, followed by a second signal of two blasts from the Bayport. There is a dispute concerning other signals—as to whether the New Orleans gave the first passing signal of one blast, and whether she replied to the Bayport's second signal of two blasts by a second backing signal of three, or by a danger signal of four blasts—but it is an undisputed fact that the Bayport repeated her signal of two blasts after receiving a signal of three blasts from the New Orleans.

It is admitted by the Bayport that while in mid-channel she signaled her intention to go to that side of the fairway or mid-channel that lay on her own port side, and that she repeated that signal. The libelant also claims that the helm of the Bayport was not changed from the time the New Orleans was first sighted until after the collision, and says that the collision occurred in mid-channel.

The inland navigation rule ordinarily applicable in this narrow channel is as follows:

"Rule 12. In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The burden is upon the Bayport to justify herself for her departure from the rule. Her explanation is: That on her port side, and overlapping her, and about 50 or 60 feet away, was her tow, the barge Bombay, going to her anchorage on the west side of the channel under her own momentum and without motive power; that there was insufficient room for the New Orleans to pass between the Bombay and the Bayport; and that there was plenty of room to pass starboard to starboard.

The libelant contends that the circumstances existing must be regarded as special circumstances, not only excusing, but requiring a departure from, the ordinary rules.

It is urged that, though she had cast off the Bombay halfway between Field's Point and Sassafras Point, or upwards of a quarter of a statute mile below Sassafras Point, the Bayport was still privileged as a towing vessel bound to stand by her tow until she was anchored, and it is further urged that it was good seamanship for the Bayport to take the middle of the channel with her barge on her port hand.

That the barge was so near the Bombay as to make her presence a sufficient reason for the Bayport continuing in the middle of the channel and giving passing signals of two blasts seems doubtful. According to the testimony of Capt. Jansen of the Bayport, he was entirely clear of the Bombay at least a quarter of a mile below Sassafras Point, and when casting off the Bombay gave an order to the Bombay to starboard her wheel. If the Bombay followed this order, and from at least half a statute mile below Harbor Junction had been working in towards the westerly edge of the channel, she would probably

have been much farther than 50 or 60 feet off from the quarter of the Bayport.

The testimony of Capt. Jansen hardly justifies the argument that the Bayport was still standing by her tow to see her safely anchored. The Bayport had left another barge, the Brittania, at Jamestown, and after leaving the Bombay at Providence was to return to Jamestown for the Brittania to take her to New Bedford; the Bayport herself being bound for Boston.

Capt. Jansen testifies: That the Bayport when abreast of Sassafras Light, and after casting off his tow, was stopped, and going no faster than he was carried by the tide; that his engines were stopped when he gave the passing signal of two blasts, and when he received three blasts from the New Orleans and repeated his signal of two blasts.

Upon a consideration of the testimony for the Bayport, I doubt whether she has satisfactorily accounted for her departure from the ordinary rule which required her to go to that side of the channel which lay on her starboard hand. There is evidence from the witnesses for the New Orleans which tends to show that the Bayport, after casting off her tow, headed somewhat to the easterly side of the channel, while the Bombay was heading toward the westerly side. The Bayport's only justification for signaling her intention to depart from the narrow channel rule is in the alleged proximity of the Bombay on her port quarter. That the Bombay was in fact so near as to have involved risk of collision between the Bombay and the New Orleans, especially if the Bayport had so directed her course to starboard as to widen the distance between her and the Bombay, is not satisfactorily shown.

The libel alleges that, shortly before the Bayport came abreast of Harbor Junction, the New Orleans was seen abreast of Wilkesbarre pier, and that the Bayport was at the time practically stationary, and without steerage way. The evidence from the Bayport differs materially from these allegations; but, assuming their truth, the diligence of the Bombay in respect to her lookout is open to grave doubt. Assuming, however, that the New Orleans was sighted, as she should have been, when the vessels were at least three-fourths of a statute mile apart, and that the Bayport was justified in signaling her intention to pass to her own port, it is apparent that she did nothing to carry out this intention; for, according to her own witnesses, her wheel was not changed, and she was in mid-channel both when she signaled and when the vessels came into collision. If her signals were justifiable, she has still to account for her own failure to act upon them. Upon the libelant's own testimony she must be charged with a failure to have a competent lookout. Thornton, the sailor charged with that duty, had gone aft to aid in letting go the hawser, and was not at his post. This becomes especially important in the case since there was a complete failure upon the part of all on board the Bayport to hear, or to see the steam from, the first passing signal of one blast blown by the New Orleans.

By the testimony of the officers of the New Orleans, and of disinterested witnesses, it is proven by a decided preponderance of evi-

dence that before the Bayport blew two blasts the New Orleans gave the first passing signal of one short blast. This signal was given when the New Orleans was to the north of Wilkesbarre pier, and at the time the Bayport was about abreast of Sassafras Light.

Capt. Rich of the steam tug Howell, who was on his vessel in the vicinity, noticed particularly that the signals were crossed, and that a single blast from the New Orleans was answered by two from the Bayport. One fact seems to be established: That immediately upon receiving a signal of two blasts from the Bayport, whether as a cross-signal or as the first signal, the New Orleans at once blew three blasts and reversed her engines full speed astern. I find also that, upon the repetition of the two blasts by the Bayport, the New Orleans blew the danger signal of four blasts. That the New Orleans did all that she could to check her speed is apparent.

The Bayport also claims that her own engines were reversed before the collision. It is conceded, however, that she blew no signals to indicate it, and that she gave no danger·signal. If her engines were reversed, it was only a very brief time before the collision.

The charge that the collision was due to excessive speed of the New Orleans is not made out. The New Orleans had left her dock at 3:43, and her engines were not speeded until 3:45. Running at this speed for about two minutes, with a head tide of about a knot and a half, she had probably not attained a speed of more than 5 or 6 knots. Her officers say that, owing to the head tide, she was not making more than 4½ knots over the ground. As her engines had been reversed for three minutes before the collision, with the tide against her, she must have been running very slowly at the time of collision. The master of the New Orleans says that she had sternway and was moving up the river, and the master of the Bayport gives the New Orleans a speed of 1 or 2 knots at the moment of collision.

At this time, and for several minutes before, the helm of the New Orleans was held amidships. She was seeking to avoid collision by going backwards.

According to the libel and the evidence for the Bayport, the Bayport was practically without steerageway and was being carried only by the tide until her engines were reversed.

Under the circumstances it is not apparent that any change of the heading of the New Orleans while reversing would have had any other effect than to change the angle of collision.

Upon the whole case I am of the opinion that the Bayport has failed to show that the collision was due to any fault in the management of the New Orleans. She was following her usual course, and, according to her officers and to the probabilities of the case, the presence of the Bombay well towards the westerly side of the channel was not a sufficient reason for a departure from the ordinary rule. Capt. Nickerson places the barge at a distance of 300 feet from the Bayport, and says that there was plenty of room for the New Orleans on the westerly side of the channel. The evidence is, in my opinion, insufficient to support the contention that the Bayport was a privileged vessel on account of the tow, which she had cast off at least five minutes

before the collision. Capt. Nickerson testifies that when he signaled by one blast the Bayport was about in the center of the channel but heading to the eastward, while the barge was heading to the westward. The Bayport bore a quarter of a point on his port bow. This heading of the barge accords with the evidence of Jansen that when the barge was cast off her wheel was ordered to starboard, and the easterly heading of the Bayport is testified to not only by the officers of the New Orleans, but by the witnesses Packard and Rich. Had the Bayport followed the usual course of an independent vessel, uninfluenced by any vague notions concerning the ability of the New Orleans to pass the Bombay safely, the collision would not have occurred.

The maneuvers of the Bayport after casting off the Bombay are not satisfactorily explained. The argument that she was still in attendance upon her tow is not supported by the testimony. Apparently the Bayport had discharged her duty to her tow and was through with her. Her next duty was to return to Jamestown for a barge which she had left there while bringing the Bombay to Providence. The Bayport was to proceed with the second barge to New Bedford, and there is no testimony to show that she herself intended to go further up the river when she sighted the New Orleans. The suggestion is made that she was about to cross over to the westerly side of the channel preparatory to her return to Jamestown when she first discovered the New Orleans, and that she then changed her intended course and went to the westerly side. This, however, is conjectural.

As I am of the opinion that the Bayport has failed to show any fault of the New Orleans, it is unnecessary to consider in detail the many faults charged to the Bayport.

The libel will be dismissed.